CHARLES MARTHINSON AND JAMES L. WHITE v. GEORGE N. WAGNER AND CHARLES C. FOLLMER.

*Sale—Delivery of property—Evidence.*

1. Plaintiffs and defendants claiming the ownership of a quantity of shingles from a common vendor, plaintiffs replevied same, and on the trial a conversation between the vendor and the agent of defendants, who was engaged in counting the shingles, regarding same, was held admissible, as also evidence of the state of defendants' account with the vendor growing out of such purchase.

2. On an examination of record, instructions to jury held proper, and judgment affirmed.

Error to Kent. (Montgomery, J.) Argued October 5 and 6, 1886. Decided November 11, 1886.

Replevin. Plaintiffs bring error. Affirmed. The facts are stated in the opinion.

*T. J. O'Brien,* for appellants.

*Taggart, Wolcott & Ganson,* for defendants.

MORSE, J. The plaintiffs brought replevin for three carloads of shingles. Both parties claimed to have purchased these shingles of Crinnian Brothers, who operated a mill at Lilley's Siding, Newaygo county.

The shingles in controversy were 247,500 XXX, or stars, and 48,000 6-inch C. B., or seconds, all 18-inch pine shingles.

December 18, 1884, the defendants and Crinnian Brothers entered into the following contract:

"GRAND RAPIDS, MICH., December 18, 1884.

"We hereby sell to Wagner & Follmer, of Grand Rapids, Mich., the cut of our shingle-mill from date until April 1, 1885, excluding the cut of a million in the month of February,—mill located one and half miles from Lilley's Junction, Newaygo, Mich.,—good, merchantable, clear, XXX, 16-inch shingles, @ $2.05 per M., and 5-inch C. B. @ 77½ cts. per M., free on board cars at Lilley's Junction; no intermediate grades to be taken out; shingles to be piled not less than 100 feet from the mill, and to be well covered, and protected from weather and storm; payments in cash, to be made semi-monthly, on the twentieth of each month for all cut up to the fifteenth of same month, and on the tenth of each month for all cut during latter half of preceding month; shingles to be warranted to be good, well made, and merchantable XXX, to be strictly clear, and the 5-inch to run from 5-inch clear butt to clear; mill to run continuously, ordinary interruptions and repairs excepted.

                                         "CRINNIAN BROS.
                                         "WAGNER & FOLLMER."

February 7, 1885, another contract was entered into by the same parties, by which Crinnian Brothers sold their cut for that month to defendants. The contract reads as follows:

"GRAND RAPIDS, MICH., February 7, 1885.

"We hereby sell to Wagner & Follmer, of Grand Rapids, Mich., our February cut of shingles, XXX clears, 5 to 2¼, at $2.45, and 6 in. C. B. at $1, on same terms of payment as our agreement for contract dated December 18, 1884, for 16-inch shingles. This contract to include all conditions as to quality, loading, etc., as said contract of December 18.

                                         "CRINNIAN BROS."

The plaintiffs claim to recover upon the following receipt or agreement made later, to wit:

"$5.00.               GRAND RAPIDS, MICH., 3d, 10th, '85.

"Received of Marthinson & White five dollars, on account of 325 M. 18-inch XXX, 5 to 2¼, and 325 M. 18-inch C. B.'s, six-in., 5 to 2¼, shingles, XXX $2.40, C. B. $1.00, F. O. B. Cars, 4 ct. rate over Grand Rapids, now cut and piled at Lilley's mill station; it being optional with Marthinson & White whether they take shingles or not, if grade, etc., is not satisfactory to them after looking them over. In this

event the $5 to be returned them. If trade is made, Marthinson & White to give their sixty-day paper in payment.

"CRINNIAN BROS."

The evidence upon the part of the plaintiffs tended to show that this paper was executed on the tenth of March, 1885, in the forenoon. On the same day their agent, Mr. Sprague, was instructed to proceed to the mill, and inspect the shingles, and close up the trade, if everything was satisfactory.

Sprague arrived at the mill that evening, and the next morning, in company with one of the Crinnian Brothers, inspected the shingles. He found more shingles of each grade piled up there than plaintiffs' contract called for, and proceeded to count out 325 M. of each kind, and branded them with stencil mark, "Marthinson & White." Heard nothing, while there, about defendants, or their claim to the shingles. He delivered a $1,000 60-day note of plaintiffs to Crinnian Brothers to close up the contract, and returned to Grand Rapids that day. March 12 plaintiffs paid the note. Sprague claims he saw no marks upon the shingles on the eleventh. When Sprague closed up the sale, he took from Crinnian Brothers the following bill of sale or contract:

"GRAND RAPIDS, March 11, '85.

"Received of Marthinson & White $1,000, their sixty-day paper from March 11, payment for 325 M. 18-inch XXX, 5 to 2¼, and 325 M. 18-inch six-inch C. B., 5 to 2¼, shingles, now piled and stenciled with Marthinson & White's brand at Crinnian Bros.' mill at Lilley's mill station; Marthinson & White retaining $100 until the shingles are all shipped, this amount being retained to secure the loading of said shingles, also for any rebate that may arise from poor quality, etc. The above amount of each grade of above-mentioned shingles are free from any and all liens or incumbrances; all to be loaded F. O. B. cars, and shipped according to the orders of Marthinson & White; grades guaranteed.

"CRINNIAN BROS."

A few days afterwards, Sprague went to the mill again,

63 MICH.—35.

and found the shingles being loaded upon cars by the defendants. · He forbade the loading of any marked as heretofore stated by him. Defendants paid no attention to Sprague, and, soon after, plaintiffs replevied the shingles in controversy in this suit, and claimed they were all a part of those selected, marked, and paid for by them.

The defendants' evidence tended to show that the shingles purchased by plaintiffs were a part of a large pile, from which they were never separated or counted by plaintiffs or their agent. They claim all these shingles under their contracts, and that they were piled at the mill in reference to such contracts, and some of each pile was marked by them before Sprague was at the mill. Some of the shingles replevied bear defendants' brand, and Sprague admits that, when he was there the second time, he saw at least one bunch bearing defendants' brand.

The defendants also introduced testimony to the effect that, after Crinnian Brothers commenced cutting under the first contract, they made oral reports of the number of shingles cut by them from time to time to defendants, who thereupon gave them credit for the amount, at the prices named in the contract.

The shingles so cut were to be marked with defendants' brand, and were so marked and piled at the mill, and shipments of the same were made by the Crinnian Brothers as ordered at different times by defendants. On the seventh of March, 1885, L. B. Wagner, an agent of the defendants, went to the mill to look at the shingles, and count them up. He counted up all the 18-inch shingles then on hand. These shingles were then in two piles,—a large one, out of which Sprague afterwards, as he claims, selected the shingles purchased by plaintiffs, and a smaller one. Wagner reported to defendants the shingles then on hand as follows: 426 M. 18-inch XXX, and 376 M. 18-inch C. B.'s.

Before this, on the fourth of March, one Baker, also an

agent of defendants, had been up and counted out the shingles on hand. The last payment by defendants to Crinnian Brothers was made on that date. Defendants claimed that the shingles received by them, including those replevied in this suit, lacked some $30 of meeting the payments they had made.

L. B. Wagner's testimony also tended to show that when he counted the shingles at the mill, on the seventh of March, they were designated and pointed out to him by one of the Crinnian Brothers as the shingles of defendants.

Upon the evidence, under the charge of the court, the jury rendered their verdict for the defendants.

The main errors relied upon are alleged to be in the instructions of the court to the jury.. Two objections to the admission of testimony only are urged.

A witness was permitted to state the conversation between one of the Crinnian Brothers and L. B. Wagner at the time he was at the mill to count up the shingles. What was said and done between Crinnian Brothers and Wagner at that time was clearly admissible.

Defendants were also allowed to show how their account stood with Crinnian Brothers,—what payments had been made them, and how many shingles had been received upon the contracts. We can see no objection to this. It certainly had a bearing upon the good faith of defendants' claim, which was attacked by plaintiffs, and tended also to maintain defendants' claim that they were entitled to all the 18-inch shingles sawed out and piled at the mill March 7, 1885.

The main fight upon the trial of this case had reference to the 18-inch shingles cut after the last day of February. The defendants claimed that they were entitled to all the shingles cut and on hand March 7, and that they were sufficiently pointed out, designated, and turned over on that date to constitute a delivery in law and in fact of the same.

The plaintiffs insisted that defendants had no title to any

of the shingles cut in March; that they could only hold under the contracts, which contracts related solely to 16-inch shingles, and 18-inch shingles cut in February, and that the burden was upon them to show that the shingles in controversy were cut in February, and not in March; and, there being no identification of the shingles replevied as being those cut in February, the verdict should be directed for the plaintiffs.

The court refused to take this view of the case, and instructed the jury, in that respect, as follows:

"I instruct you, gentlemen of the jury, that under this contract the title to those shingles would vest in Wagner & Follmer when they were designated as their shingles, and when the parties intended that the particular shingles so designated and pointed out should become the property of Wagner & Follmer; and that if Crinnian Brothers reported to Wagner & Follmer shingles which it was intended should become their property, and they made payments for them or upon them, and that it was the intention of those two parties that those shingles were the shingles that had been manufactured under this contract, and that the title was to vest in Wagner & Follmer, that the title would so pass without a delivery, and that no further delivery would be necessary to vest the title in Wagner & Follmer.

" Now, there are certain of these shingles which appear not to have been cut in February. At least, it is claimed that certain of those which were pointed out to L. B. Wagner on the seventh day of March were shingles which had been cut in March, or probably cut in March. Upon that question I instruct you that if the two parties—Mr. L. B. Wagner, acting for Wagner & Follmer, and Crinnian Brothers—examined the shingles in question, and they were pointed out as the shingles of Wagner & Follmer, cut under this contract, and accepted as such by L. B. Wagner for the firm of Wagner & Follmer, that this would render immaterial the question of whether they were cut in February; that the parties had the right to extend this contract, and, if they were accepted by the firm of Wagner & Follmer as shingles described in this contract, and coming under this contract, and were so designated and intended by Crinnian Brothers, and the intention was that these shingles should become the property of Wagner & Follmer, that this would vest the title in Wagner & Follmer to those shingles.

"If, on the other hand, the intention of the parties, as evidenced by their course of dealing,—if you are able to find or should find from the evidence that the intention of the parties, —was that the title to those shingles should not pass until something further was done by one party or the other, then the title would not vest in them, and the plaintiffs would be entitled to recover."

There was evidence tending to show that the mill kept running from the seventh of March until the eleventh, when Sprague selected out the purchase of plaintiffs. In relation to the shingles thus cut the court instructed the jury, in substance, that if there were any of them in the pile, and taken under the replevin, the title to them did not vest in defendants; and that, if the jury were able to separate or distinguish such shingles from the others, the plaintiffs should recover for them.

This last instruction placed the burden of proof upon the plaintiffs to show title in the shingles; or, in other words, that the shingles, or a portion of them, taken by defendants, were cut after the seventh of March. We find nothing in the evidence, or the circumstances of the case, to change the ordinary rule as to the burden of proof. It is true that on the eleventh of March plaintiffs caused all the shingles in the large pile to be branded in their names, but at the same time they made no distinction between the shingles cut before or after March 7, but marked all they claimed in the pile, and did not separate them from the others. The mark upon them, therefore, raised no presumption that they were cut after March 7, and the defendants, in taking and loading them as they found them, were not put in any different position as regards those cut after than they were as to those cut before March 7.

The plaintiffs were in court with the *onus* upon them to establish their title to these shingles, and there is no fraud chargeable to the defendants in mixing the shingles in a

common mass, by which the burden can be shifted upon them.[1]

There is no doubt but Crinnian Brothers contemplated a fraud upon some one by selling their shingles twice, and the mixing was done by them, but whether with an honest or dishonest intent at the time does not concern us here, as the defendants cannot be charged with their wrong-doing.

Besides, under the contract as first made, the defendants were entitled to the whole cut of the mill until April 1, excluding only the February cut. That was afterwards contracted for, and by a verbal agreement or tacit understanding of the parties was to be 18-inch and 6-inch C. B.'s. After the expiration of February, instead of resuming the cutting of 16-inch, the mill kept on manufacturing 18-inch shingles. There was evidence looking toward a turning over of this cut in March, on the seventh, to defendants, under the first contract; and I have no doubt that if it had not been for the failure of the Crinnian Brothers, and their attempt to sell their shingles twice, the whole March cut would have been turned over to defendants, without question, under the contracts, whether such cut was 16-inch or 18-inch.

They were probably piled on the same pile with the others with that intention, and the only reason why they would not belong to defendants would be a want of sufficient delivery.

So many of the 18-inch shingles as were turned out to defendants, and counted by L. B. Wagner, were indisputably the property of defendants. The whole charge of the court in this respect was, if anything, more favorable to plaintiffs than it ought to have been.

It is clear to my mind that the counting out of the shingles, and the marking of a bunch or two on the top of each pile with the brand of defendants by Wagner, was sufficient to vest them with the title, as nothing remained to be done

---

[1] See *Bethel v. Linn*, 63 Mich. 465 (head-note 4).

thereafter by either party except to load them upon the cars as required by the contract.   This was a complete delivery of the shingles; and, in view of the contracts, and the dealings between the parties under them, I am of the opinion that the piling of the shingles cut after March 7 upon these piles, so marked and delivered, was a delivery also of such shingles under the contracts, if the defendants saw fit to accept them.

The court charged the jury properly that if they found from the dealings of the parties that it was their intention to continue the cutting of 18-inch shingles into March under the contracts, and that advances were made upon the strength of the supposed cut for that month, and that defendants' agent went upon the premises March 7, and examined and inspected the shingles so cut, and that both parties intended that these shingles should come under the contracts, then the title to them passed.

I find no error in the proceedings.   The judgment is affirmed, with costs.

The other Justices concurred.